UNITED STATES of America, Plaintiff,

v.

David W. HART, Defendant.

Crim. No. 75–151.

United States District Court,
S. D. Iowa, C. D.

Aug. 4, 1976.

Theodore L. Preg, U. S. Dept. of Justice, Crim. Div., Management and Labor Section, Lee J. Radek, Sp. Atty., Crim. Div., Dept. of Justice, Washington, D. C., Allen L. Donielson, U. S. Atty., and Paul A. Zoss, Asst. U. S. Atty., Des Moines, Iowa, for plaintiff, United States.

Lex Hawkins, Arthur C. Hedberg, Jr., and Glenn L. Norris, Hawkins, Hedberg & Ward, Des Moines, Iowa, for defendant, David W. .Hart.

Elliott Bredhoff and Robert M. Weinberg, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., for amicus curiae, Industrial Union Dept. AFL–CIO.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This is a criminal prosecution brought under 29 U.S.C. § 501(c) (1970) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.,* attacking the propriety of a union official's actions in paying the legal fees and fines incurred by certain union members who were charged with various state and federal crimes incident to a spree of strike-related violence.

On October 7, 1975 a seven-count indictment was returned against the defendant,

David W. Hart. Each count alleges a violation of Section 501(c), which makes it a crime for a union official to embezzle, steal, or convert to his or another's use the money or assets of his union. Section 501(c) violations are punishable by a fine of up to $10,000, or imprisonment of up to five years, or both. After defendant's plea of not guilty to the charges, this case came before the Court for jury trial on January 12, 1976. Discussions took place between the parties on that day however, and it was agreed by them that no factual issues are in dispute and that the case could be submitted to the Court, without a jury, upon a stipulation of facts. Pursuant to this understanding, a stipulation was filed by the parties on January 13, 1976, and defendant has waived his right to trial by jury. See F.R.Crim.P. 23(a). Defendant filed a motion to dismiss the indictment on March 2, 1976. The Court heard oral arguments in the case on April 5, 1976, and all briefs and resistances have been filed.[1] The case is being submitted to the Court in a dual posture; while there is a motion to dismiss pending, the parties have agreed that the Court should proceed directly to the merits of the case, as controlled by the stipulation of facts, should that motion be overruled. In this regard, the Court deems that defendant's motion to dismiss the indictment should now be overruled. Viewed on its face, the indictment "sufficiently charges an offense" and thus survives the motion to dismiss. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Luros*, 243 F.Supp. 160, 165 (N.D.Iowa 1965). Stated differently, the Court deems that the type of acts alleged in the indictment, under certain circumstances, *could* justify a conviction under 29 U.S.C. § 501(c). While the Court's ultimate conclusion today is that such circumstances do not exist in this case, it deems the indictment sufficient to survive the

pending motion. Accordingly, defendant's motion to dismiss the indictment is overruled in all its particulars. The Court will now proceed to discuss whether the Government has proven the defendant's guilt beyond a reasonable doubt.

## FACTUAL BACKGROUND

The parties' stipulation of facts is attached hereto as an Appendix; a brief summary of those facts is necessary before addressing the legal issues presented herein.

The Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (AMC & BW) is a labor organization representing, among others, certain employees of the Iowa Beef Processors (IBP) plant in Dakota City, Nebraska. The AMC & BW is an international union which is divided into certain geographical districts. District 11 of the AMC & BW covers Iowa, Nebraska and South Dakota. District Council 11 is a subordinate body of the international union; its members are local labor unions affiliated with the international. At all times pertinent to this indictment, defendant Hart was a vice president of the international union and director of District 11; by reason thereof, he was also president of District Council 11.

An authorized strike of the IBP plant in Dakota City was begun in August of 1969 by the AMC & BW. The strike lasted until April, 1970, approximately eight months. During this time certain acts of violence occurred in the Sioux City, Iowa area, just east of Dakota City. A number of various criminal prosecutions were subsequently commenced in state and federal courts against certain AMC & BW members whose cases are pertinent here. The charges against these union members ranged from violations of firearms and destructive devices laws to allegations of murder, arson and giving false statements to grand juries.[2] The incidents which gave rise to

---

1. On April 2, 1976 a "motion for leave to file brief amicus curiae" was filed by the Industrial Union Department of the AFL–CIO. The Court sustains that motion, and has considered the Department's brief. A resistance thereto was filed by the United States on April 14, 1976.

2. The particulars as to the defendants, the charges, and outcome of these cases are detailed in the Appendix at "8. Criminal Activities."

these criminal charges were reported in the local media as being related to the IBP strike. Harry Smith, a Sioux City lawyer, was retained by the union to represent all of the defendants. He was their sole counsel in the state court cases, and was assisted by others in the federal prosecutions. Each count of the indictment against defendant Hart pertains to the payment from union funds of some type of legal costs incurred in the defense of these union members.[3] The payments, which covered attorneys fees, fines, and transcript costs, were made by way of checks drawn on accounts of District Council 11 at the Capital City State Bank in Des Moines, Iowa. The question before the Court is whether defendant's payment of these legal fees, fines, and other costs subjects him to criminal liability under 29 U.S.C. § 501(c).

## LEGAL DISCUSSION

The Government must establish three elements beyond a reasonable doubt to sustain its burden of proof in this case: (1) that District Council 11 is a labor organization within the terms of § 501(c); (2) that the defendant was an officer or employee of that organization; and (3) that the defendant did knowingly and willfully embezzle, steal, abstract or convert to his own use or to the use of others the monies or funds of that organization.

Elements 1 and 2 have been stipulated to by the parties. Thus, the Court accepts as established the propositions that District Council 11, AMC & BW, is a labor organization engaged in an industry affecting commerce as defined in 29 U.S.C. §§ 402(i) and (j), and that the defendant was an officer of that organization at the times pertinent to the indictment. (¶¶ 4, 5, Stipulation). As to Element 3, however, the parties are in disagreement. The Government has taken the position that insofar as Element 3 is concerned, a violation of § 501(c) can be proven in either of two ways in this case. The first is by proving that the defendant (1) possessed a fraudulent intent to deprive the union of its funds and (2) that there

was a lack of proper union authorization for the expenditures. The Government also urges, however, that even if the payments were authorized, a conviction is still possible upon a showing of (1) fraudulent intent and (2) a "lack of benefit" to the union. The position of the defendant, and more particularly *amicus curiae,* is that once authorization is established, it is improper to inquire as to the union's benefit, except in certain narrow instances not applicable here.

The Court has no doubt that the Government's first alternative is a proper one. Indeed, the ruling of the United States Court of Appeals for the Eighth Circuit in *United States v. Goad,* 490 F.2d 1158 (8th Cir.) *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), clearly establishes that "(1) fraudulent intent to deprive the union of its funds and (2) lack of authorization according to the union's constitution and bylaws" are the essential elements of a § 501(c) charge. 490 F.2d at 1166. In so holding, the *Goad* court squarely rejected the argument of the defendant union officials that a § 501(c) conviction required fraudulent intent, lack of authorization, *and* a lack of benefit to the union. *Id.* at 1165–66; *accord, United States v. Nell,* 526 F.2d 1223, 1232 (5th Cir. 1976). Left open, however, was the question of whether fraudulent intent combined with a lack of union benefit would support a conviction in situations where authorization was present. *Id.* at 1166. As in *Goad,* however, that question need not be decided here; fraudulent intent, an essential element via either route to conviction, has not been established by the Government. The record similarly discloses a failure of proof as to lack of authorization. Accordingly, the defendant must be acquitted on all seven counts of the indictment.

## AUTHORIZATION

The question of whether union expenditures are properly "authorized" must be addressed in the context of the union's constitution, bylaws, and resolutions adopted thereunder. 29 U.S.C. § 501(a); *Goad, su-*

---

**3.** The particular payments are listed in detail under "9. Payments" in the stipulation.

*pra,* at 1166. The Court's review of the constitution of the AMC & BW and the constitution and resolutions of District Council 11 reveals ample authority for the challenged expenditures.

Section V of the AMC & BW International Constitution states in part:

*Object of the International Union*: The object of this International Union shall be . . . to afford mutual protection to members against the obnoxious rules, unlawful discharge or other forms of injustice or oppression . . .

To engage all such civic, social, political, legal, economic, cultural, educational, charitable and other activities, whether on local, national, or international levels, as will advance this International Union standing in the community and in the labor movement and further the interests of the International Union and its membership, directly or indirectly . . .

To support and encourage such other objectives of which working people may lawfully combine for their mutual protection and benefit. (Exhibit 27, at 3–4).

Pursuant to Section A of Article VI of the District Council's Constitution, the Council's Executive Board "shall execute the instructions of the convention and shall transact all business of the District Council between conventions." (Exhibit 28, at 4). Within this context, the Executive Board of District Council 11 unanimously passed the following resolution on August 29, 1969:

That the Chairman of the District Council [David W. Hart] be authorized to spend the total assets of the organization if necessary to prosecute our actions against IBP. (¶ 12, Stipulation).

In this regard, the following stipulated facts are crucial: The August 29 resolution was intended by a majority of the board members present to give the defendant authority to spend District Council funds "for all purposes which funds are ordinarily and customarily used" by the union in relation to an authorized strike; the resolution was so understood by the defendant; and

It is and has been for many years past the custom of the Amalgamated Meat Cutters, the United Packinghouse Workers and other members of the AFL–CIO to retain attorneys to handle the legal problems of the union and its members during an authorized strike, and as a part of that practice it is and has been the custom of said unions to pay the legal fees and fines of strikers for civil and criminal charges against union members arising out of the strike. (¶¶ 11, 12, Stipulation).

■ Thus, the record as to prior authorization reveals a broad grant of general authority in the international constitution, implementation of that grant by the District Council through a resolution which gave the defendant specific authority to make "customary" strike-related expenditures, and a context of a stipulated custom that legal fees and fines of strikers be paid by the union. Moreover, to the extent such prior approval could be characterized as vague or general, the defendant, as president of the District Council, was empowered by Section A of Article XVII of the District Council's constitution to interpret the international constitution. His interpretations were subject to appeal to the Executive Board, and nowhere in the record is it indicated that the defendant's views as to legal expenditures were ever challenged. In sum, the record fully supports the defendant's contentions that he derived direct authority to make the challenged expenditures from the union's constitutions and the August 29, 1969 resolution. While this in itself is sufficient to defeat the Government's claim of lack of authorization, the record also reflects a ratification of the defendant's expenditures by the union.

All of the payments challenged in the indictment were made by way of checks drawn on the District Council's accounts. Each check was recorded in the proper ledger books. All checks as to attorneys' fees and fines were recorded in the strike fund ledger (Exhibit C); the one check for transcript costs was recorded in the organizational fund ledger (Exhibit B). Financial reports were compiled quarterly from these ledgers, and all were approved by the Dis-

trict Council. (¶ 14, Stipulation). The ledger books which reflected the challenged expenditures were made available to the Executive Board members at their meetings, and the defendant was also available at Council meetings to discuss any of the pending cases or expenditures. While specific cases were discussed only once at a Council meeting, it is stipulated that the defendant "fully answered" any questions asked about the expenditures. (¶ 15, Stipulation). Further, it is stipulated that the quarterly financial reports were compiled into annual reports, and these in turn were submitted to the annual district conventions in the form of an Officers' Report. (¶¶ 21, 22, Stipulation). It is also stipulated that all Officers' Reports pertinent to the challenged expenditures were approved at the annual conventions; further, the annual financial reports and District Council records were audited by auditors of the international union. Thus, the record reveals both a prior authorization for the challenged payments and a subsequent ratification thereof.

The United States bases its argument that the legal expenditures were unauthorized on four major grounds: (1) that *specific prior authorization* of the Executive Board was not given to each expenditure; (2) that the actual payments were not made until 1971 and 1972, almost two years after the end of the strike and three years after the August 29, 1969 resolution; (3) that no effective ratification could take place because the records of the challenged payments were "buried" among legitimate expenditures in the union's books; and (4) that the severity of the crimes for which certain of the union members were charged places the expenditures for those items outside of any proper authorization that might have been given. It is the Court's conclusion that each of these four arguments is without merit.

Considering the Government's argument regarding specific prior approval of each payment, it is the Court's conclusion that the August 29, 1969 resolution of the District Council Executive Board provided all the "specific approval" the defendant needed. The following proposed jury instruction reflects the Government's theory as to prior authorization:

The Government introduced evidence of the Constitution of the Amalgamated Meat Cutters and Butcher Workmen of North America and the Constitution of District Council 11 of that International.

Those documents read in part:

"The business secretary shall pay, by check, all bills authorized by the District Council or the executive board. All checks shall be countersigned by the president."

and

"All bills and expenditures must be approved by the Union Executive Board before payment is made by the Financial Secretary, except that payment of regular normal operating expenditures, including but not limited to rent, light, taxes, salaries, telephone, office supplies, equipment and obligations owing to the International Union and other organizations to which the Union is affiliated shall be made when due by the Financial Secretary and reported at the next following regular meetings of the . . . Union Executive Board. . . ."

You are instructed that if you find the expenditures charged in this case are the type of expenditures that come within these constitutional articles, then the method of authorization for such expenditures, if not for normal operating expenditures, must have been specifically approved by the Executive Board before the payment was made.

In this respect you may consider the minutes of the meetings of the Executive Board to determine if such authorization was made. You may also consider the testimony of Executive Board Members, as well as any other relevant evidence.

If you find the expenditures were of the type to come within these constitutional articles, and if you find that these expenditures were not specifically approved by the Executive Board prior to

being made, you must then find that no proper authorization was made.

Such an instruction would amount to a directed verdict on the authorization issue, for there is no specific prior approval of each payment in the minutes of the Executive Board meetings. The Government's instruction ignores key aspects of the case, however. The Executive Board is empowered by the District Council constitution to "transact all business of the District Council between conventions." (Exhibit 28, at 4). On August 29, 1969 the Executive Board passed a resolution authorizing the expenditure of funds in relation to the IBP strike. The stipulated intent of the Board was to "give . . . David W. Hart, authority to expend all funds of the District Council for all (customary) purposes" incident to a strike. Further, payment of legal fees and fines was such a customary purpose. Under these circumstances, the resolution clearly could be viewed as constituting the Board's "before payment" approval. It is reasonable to infer that the defendant so interpreted it, for he openly paid the authorized costs without seeking Board approval. In this regard it is significant that Article XVII, § A of the District Council's constitution grants *to the defendant* the authority to interpret the union's constitutions. (Exhibit 28, at 14). This interpretation was never challenged by the Executive Board or other union members. Thus, it is the Court's conclusion that the union's constitutions, when read as a whole, clearly provided the authorization for the expenditures made.

█ In response to the Government's argument that the particular payments were made two to three years after the August 29, 1969 authorizing resolution, this simply reflects the fact that litigation takes time. There is no question that the expenditures, when made, *were* for legal services arising from criminal charges related to the strike. Had an intervening resolution terminated

defendant's authority to make strike-related payments, a different issue would confront the Court. As far as the record reflects, the 1969 resolution still stands today; in any event, there is no question as to its applicability in 1971 and 1972. Equally meritless is the Government's argument that the payments pertinent to the strike were "buried" in the union's books. A review of the pertinent ledger sheets discloses the particular amounts paid, and the recipients thereof. The defendant treated these payments as normal expenditures, and the union's books reflect this.

█ The Government's final argument is their most strenuous one. Simply stated, plaintiff contends that even if the union did authorize the payment of ordinary legal costs incident to a strike, the severity of the crimes with which certain union members were charged removes the payments challenged here from the scope of that authorization. This argument must fail for several reasons. First, it is significant that the Government concedes, on page 2 of its Reply Brief filed on March 18, 1976, that the Executive Board's August 29, 1969 resolution "may have contemplated payments of fines and legal fees for the customary picket-line incidents which occur as part of a strike." It is urged, however, that the charges pertinent to this indictment could not be so contemplated. The United States is apparently arguing that the defendant should pick and choose those union members whose legal costs should and should not be paid. Neither the August 29, 1969 resolution nor the stipulated union custom supports this suggestion. Indeed, given the language of the resolution, the defendant would risk breaching his fiduciary duties by *not* implementing the authorized payments. *See Hood v. Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors*, 454 F.2d 1347, 1355 (7th Cir. 1972). In essence, the United States is seeking to impose criminal liability on the defendant for making certain expenditures with which it disagrees.[4] The defendant, however, was under

---

4. Certain limitations do circumscribe a union's authorization powers, of course. As noted in *United States v. Boyle*, 157 U.S.App.D.C. 166, 482 F.2d 755, *cert. denied*, 414 U.S. 1076, 94

S.Ct. 593, 38 L.Ed.2d 483 (1973), a case involving the spending of union funds in violation of federal campaign contribution laws, a union cannot validly authorize the expenditure of

a duty to expend funds in accordance with the union's constitution, bylaws, and resolutions. *McNamara v. Johnston*, 522 F.2d 1157, 1163 (7th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). No law prohibits an authorization such as the one pertinent here, and under these circumstances the defendant did not violate § 501(c) by implementing it. As a criminal statute, § 501(c) must be strictly construed. *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). As stated by Chief Justice Marshall,

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle, that the power of punishment is vested in the legislature, not in the judicial department. *Id.*

As the House Report on the Fiduciary Responsibilities sections of the Labor-Management Relations Act stated,

> Our language does not purport to regulate the expenditures or investments of a labor organization. Such decisions should be made by the members in accordance with the constitution and bylaws of their union. Union officers will not be guilty of breach of trust when their expenditures are within the authority conferred upon them either by the constitution and bylaws or by a resolution of the executive board, convention or other appropriate governing body (including a general meeting of the members) not in conflict with the constitution and bylaws.

H.R.Rep. No. 741, 86th Cong., 1st Sess. 81–82, U.S.Code Congressional and Administrative News, p. 2480 (1959).

In *United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975), the Court expressed concern that § 501(c) not be unduly enlarged in cases which challenge expenditures of a union official which do not inure to his personal benefit. *Id.* at 672. As the Second Circuit also noted in *United States v. Robinson*, 512 F.2d 491 (2d Cir. 1975), "Congress was principally concerned with the looting of union treasuries by union leaders for their personal profit" when it enacted § 501(c). The defendant realized no private gain from the expenditures in this case; it is stipulated that none of the monies spent were converted "to his own personal use." (¶ 3, Stipulation). Nothing appears in the record which shows the defendant to have any more than a general awareness of the strike-related activities. Defendant Hart was not personally involved with the beneficiaries of his payments. In arguing that it is permissible to pay the legal fees and fines for some strike-related offenses and not for others, the Government in effect is equating the payment of legal costs with the subsidizing of criminal activity and implying an awareness of the part of the defendant as to actual guilt. The Government further distinguishes the payment of legal costs for those defendants found not guilty from the payment of costs for those convicted. While these policy-related considerations might influence some drafters of legal expense resolutions, they are in no way reflected in the August 29, 1969 resolution. Here the defendant's interpretation of the resolution was in accord with prior union custom. Given the absence of any self-dealing by the defendant or *per se* unlawfulness of the authorized payments, it is not the Court's province to second guess Mr. Hart's actions, thereby exposing him to criminal liability.[5]

funds for an unlawful use. No contention is made here that the payment of legal fees and fines violates any state or federal statute. Similarly inapplicable is the principle that authorized union funds cannot be spent to defray the legal expenses of officers charged with defrauding their own union. *See Highway Truck Drivers & Helpers v. Cohen*, 182 F.Supp. 608 (E.D.Pa.) *aff'd*, 284 F.2d 162 (3rd Cir. 1960), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). No such conflict of interest presents itself in this case. The record

discloses no personal ties whatsoever between Mr. Hart and the union members whose legal costs were paid; nor does it reveal any personal knowledge of Mr. Hart as to the alleged criminal activities.

5. Consistent with this reasoning, the Court deems that the nature of the payments made renders impermissible any consideration of "union benefit" as an element of the charged offenses. *See* note 4, *supra*.

In sum, the Court deems the Government's four arguments as to lack of authorization to be without merit. The United States has simply failed to prove lack of authorization beyond a reasonable doubt.

## FRAUDULENT INTENT

■ Wholly aside from the question of proper union authorization of the expenditures is the matter of whether the defendant made the payments with a fraudulent intent, "that is, the intent to deprive the union of its funds . . . ." *United States v. Goad, supra,* at 1166. The offense also requires "willfulness"—an act committed voluntarily, with knowledge that it is prohibited by law, and with bad purpose to disobey or disregard the law. In this regard, mistake, accident and good faith are defenses. *Goad, supra,* at 1166 n. 10; *United States v. Dibrizzi,* 393 F.2d 642, 644 (2d Cir. 1968); *Colella v. United States,* 360 F.2d 792, 798–99 (1st Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *see* Devitt & Blackmar, Federal Jury Practice and Instructions, § 16.13 (1970). The Government's case falls far short of establishing fraudulent intent under the record presented to the Court.

■ As opposed to the bulk of reported decisions under § 501(c), this is not a case where the defendant has personally realized gain from acts of concealment, stealth, or deception. *Cf. Goad,* supra, (increased salaries for defendants); *United States v. Nell,* supra, (travel expenses and automobile furnished defendant); *United States v. Dibrizzi,* supra, (personal travel expenses of defendant billed to union as business related). While convictions are clearly appropriate in cases where defendants have embezzled or converted funds for the use of others, the key element is a taking of the union funds "knowing that the [union] would not have wanted that to be done." *United States v. Silverman,* 430 F.2d 106, 126–27 (2d Cir. 1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). There is absolutely no evidence in this record to indicate that the defendant made the challenged expenditures while knowing the union would not want those expenditures made. Indeed, the stipulated union custom was to pay such legal fees and fines, and the defendant was familiar with this custom (¶¶ 11, 25, Stipulation).

The primary argument of the United States as to fraudulent intent is that such intent must be determined from all the facts and circumstances in the case. *See Doyle v. United States,* 318 F.2d 419, 422 (8th Cir. 1963). The Court has no disagreement with this statement of the law. The underlying circumstances, however, negate such an intent. All payments which are the subject of the indictment were openly and properly recorded in the union's ledger books. General discussions were had at board meetings regarding the pending criminal cases, and on one such occasion specific cases were discussed by the defendant. Whenever he was asked, the defendant fully answered any questions regarding the payments. (¶ 15, Stipulation). There is simply no basis from which an intent to conceal facts from the union or deceive its members can be inferred. Given the nature of the payments made, the defendant had every reason to believe they would benefit the union, and that the union had authorized them. *See Ottley, supra,* at 671. These stipulated facts mandate the conclusion that the defendant acted openly and in good faith at all times and in all respects pertinent to this indictment. Insofar as the relationship of Mr. Hart and the benefitted union members is concerned, the record reveals absolutely no personal contacts which would support an inference of fraudulent intent. The defendant merely carried out what he deemed to be the union's practice regarding customary strike-related payments. Under these circumstances, fraudulent intent has not been proven beyond a reasonable doubt; this alone dictates an acquittal of the defendant as to all seven counts of the indictment.

## ORDER FOR JUDGMENT

Pursuant to the foregoing discussion,

IT IS HEREBY ORDERED that defendant's motion to dismiss the indictment is overruled in all particulars.

IT IS FURTHER ORDERED, and the Court so finds, that the Defendant, David W. Hart, is not guilty as to Counts I, II, III, IV, V, VI, and VII of the indictment.

## APPENDIX "A"

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DAVID W. HART,

Defendant.

CRIMINAL NO. 75–151

## STIPULATION

It is hereby stipulated and agreed by and between counsel for the United States, counsel for the defendant, and the defendant, David W. Hart, that:

1. The Government Exhibits 1 through 67 are made a part of this record and a copy of the Exhibit List is hereby attached.

2. The defendant's Exhibit A (Officer's Reports of the District Counsel including the 2nd, 3rd, 4th and 5th Constitutional Conventions), Exhibit B, (Financial Ledger Organization Fund 1–70–12–73), Exhibit C (Financial Ledger Strike Fund 11–68–6–73), Exhibit D, (Newspaper Article) and Exhibit E (annual financial reports of 1970 through 1974 submitted to the Department of Labor) are made a part hereof.

3. The defendant, David Hart, did not convert any of the questioned expenditures to his own personal use.

4. At all times relevant to the indictment in this case District Council 11, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (hereinafter referred to as District Council 11) was a labor organization engaged in an industry affecting commerce within the meaning of Sections 402(i) and (j) of Title 29, United States Code.

5. At all times relevant to the indictment in this case, the defendant, David W. Hart, was an officer, namely President of District Council 11.

6. District Council 11 is a subordinate body of the Labor Organization, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO. Said international union is divided geographically into districts. District 11 comprises Iowa, Nebraska and South Dakota. District Council 11 is made of local labor unions who have affiliated with the international union and the subordinate council.

The defendant at all times relevant was a Vice President of the international union and Director of District 11 and by reason thereof, President of District Council 11.

Said council is governed by the President and nine executive board members. The executive board is elected at an annual meeting.

District 11 is governed by the Constitutions of both the International and District 11. The International Constitution supercedes the District Constitution in case of conflict between the Constitutions. (Exhibits 27 and 28).

There are three levels of authority within District Council 11. The president has day-to-day responsibility. An executive board meets quarter-annually. Additionally, there is annual convention attended by del-

egates from each of the local unions within District Council 11.

7. At all times relevant to the indictment in this case, the moneys and funds contained in the Strike Fund of District Council 11 and the Organization Fund of District Council 11, which were maintained in accounts in the Capital City State Bank in Des Moines, Iowa, were the moneys and funds of District Council 11.

8. *Criminal Activities*

A. In August 1969, an authorized strike was begun at the Iowa Beef Processors Plant in Dakota City, Nebraska by the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO. The strike lasted until April, 1970.

B. During this period, there were acts of violence in the Sioux City, Iowa area from which criminal charges arose.

C. The individuals, the charges, and the disposition of those charges which are relevant to the indictment are as follows:

1. ERVIN J. LANGEL
 LYLE L. GREENOUGH
 MYRON D. REIHE

These individuals were charged on a three-count indictment by a Federal Grand Jury in the Northern District of Iowa for violation of the federal destructive devices laws. These charges resulted out of an incident where three dynamite bombs were planted in three trucks of the Rosenthal Trucking Company in Sioux City, Iowa. The defendants were offered the opportunity to plea to lesser charges, but one refused. The defendants were convicted after a jury trial in the United States District Court in Sioux City, Iowa. This conviction was affirmed on appeal by the United States Court of Appeals for the Eighth Circuit. The records relative to these charges are Exhibits 29–35.

2. HAROLD E. JOHNSON

This individual was charged on separate counts in Woodbury County, Iowa, with murder and assault with intent to commit murder. The defendant was charged with shooting and killing Nancy Nielson in Sioux City, Iowa, and shooting and wounding her sister, Michaelene Nielson. (See Exhibit D). As a result of plea bargaining, he entered a plea of guilty to the lesser charge of manslaughter and assault with intent to commit a felony. The records relative to these charges are Exhibits 53–58B.

3. ROGER HARNACK.

This individual was charged on separate counts in Woodbury County, Iowa, with arson and injury to property. The arson charge was for the burning of a garage in Sioux City, Iowa. The injury to property charge was for dynamiting a residence in Sioux City, Iowa. As a result of plea bargaining, the defendant entered a plea of guilty to the arson charge and the injury to property charge was dismissed. The records relative to these charges are Exhibits 59–62.

4. VAL FOX
 CLIFFORD HANSEN
 ERVIN LANGEL

These individuals were charged with perjury in Woodbury County, Iowa, for giving false statements to a grand jury. These false statements concerned these individuals' involvement in illegal possession of dynamite and are set forth in exhibits 40–45. This grand jury had been empanelled to investigate strike activities. As a result of plea bargaining, these defendants entered a plea of guilty to the lesser charge of obstruction in the administration of justice. They were fined $1,000.00 each. (See exhibits 46–50).

5. LENTON DAVIS

This individual was charged with perjury in Woodbury County, Iowa, for giving false statements to a grand jury. These false statements were concerning the defendant's involvement in illegal transportation of a firearm across a state line. This grand jury had been empanelled to investigate strike activities. As a result of plea bargaining, the defendant entered a plea of guilty to the lesser charge of obstruction in the ad-

ministration of justice and was fined $1,000.00. (See exhibits 49–52).

### 6. HAROLD E. JOHNSON EDWARD LEFFLER

These individuals were charged on a two-count indictment by the Federal Grand Jury of the District of Nebraska for violations of the federal destructive devices laws. These charges resulted out of an incident where a vehicle parked outside a residence in Nebraska was dynamited. As a result of plea bargaining, the charges against Harold Johnson were dismissed because of his plea to manslaughter and assault with intent to commit a felony in state court in Iowa. As a result of plea bargaining, Edward Leffler entered a plea of nolo contendere to one count of the indictment and the other count was dismissed. (See Exhibits 63–67).

### 7. LENTON DAVIS

This individual was charged by a Federal Grand Jury in the District of Nebraska on a four-count indictment charging him with one count of illegal possession of a firearm and three counts of violation of the federal destructive devices laws. The firearm charge resulted from the defendant carrying a rifle across a state line with a previous felony conviction. The other three charges were the result of three bombings of buildings in Nebraska, one business and two residences. As a result of plea bargaining, the defendant entered a plea of nolo contendere to the firearms charge and the other charges were dismissed.

D. Newspapers and news media in the three State area of Iowa, Nebraska, and South Dakota reported news of the above-mentioned incidents as if they were related to the activities of the IBP strike. (See for example Exhibit D).

E. All of the above defendants were represented in these criminal actions by Harry H. Smith, a Sioux City, Iowa, attorney. He was the sole counsel in the state actions. In the federal actions he was assisted by Donald O'Brien, a Sioux City, Iowa, attorney in the Iowa federal actions and by Frank Kneifl, a Nebraska attorney, in the Nebraska federal actions. The charges in the present case are all based on the payment of the legal fees, fines, and expenses incurred in the above-described criminal actions out of the funds of District Council 11 of the Amalgamated Meat Cutters and Butcher Workmen of North America, by the defendant David W. Hart.

### 9. *Payments*

A. The bills, checks, and transmittal letters which are the subject of the questioned expenditures are set forth in Exhibits 7–26.

B. All of these bills are acknowledged to be accurate statements of the services, expenses and costs involved.

C. The facts regarding the payments with respect to each count in the indictment are as follows:

1. With respect to Count I of the indictment, (a) a payment of $3,376.50 was made to Donald O'Brien in Sioux City, Iowa, for trial services in the representation of Lyle L. Greenough, Ervin Joseph Langel, and Myron D. Reihe on the criminal charges brought against them in the United States District Court in Sioux City, Iowa. (b) This payment was made by Check No. 504, dated April 2, 1971, drawn on the Strike Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa. (c) This check was negotiated by Donald O'Brien at the First National Bank in Sioux City, Iowa on April 14, 1971. (d) Said check was posted at Des Moines, Iowa and received by United States mail by Donald O'Brien in Sioux City, Iowa. (See Exhibits 7, 8 and 9).

2. With respect to Count II of the indictment, (a) a payment of $3,067.00 was made to Harry Smith in Sioux City, Iowa to pay fines and court costs incurred by Clifford Hansen, Val Fox and Ervin Langel as a result of criminal charges brought against them in Woodbury County, Iowa for perjury. A fine of $1,000 each was paid as a result of a plea of guilty by said persons to a lesser charge of obstructing justice. (b) This payment was made by Check No. 578, dated May 11, 1971, drawn on the Strike

Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa. (c) This check was deposited to the account of Harry H. Smith at the First National Bank in Sioux City, Iowa on May 13, 1971. (d) Said check was posted at Des Moines, Iowa and received at the office of Harry H. Smith by United States mail in Sioux City, Iowa. (See Exhibits 10 and 11).

3. With respect to Count III of the indictment, (a) payment of $10,294.02 was made to Harry H. Smith in Sioux City, Iowa for his services and costs in the representation of the following individuals: $2,441.90 for Langel, Greenough and Reihe for trial services with respect to their federal charges; $1,919.00 for Hansen, Fox, and Langel with respect to their perjury charges in state court; $3,189.06 for Harold E. Johnson with respect to the charges in Woodbury County, Iowa of murder and assault with intent to commit murder to which said person pled guilty to the lesser charges of manslaughter and assault to commit manslaughter; $2,744.06 for Roger Harnack with respect to charges in Woodbury County, Iowa for destruction to property and arson to which one charge was dismissed and a plea of guilty was entered on the other charge. (b) This payment was made by Check No. 600, dated May 18, 1971, drawn on the Strike Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa, in the amount of $13,881.02, of which the $10,294.02 represents a portion thereof. (c) This check was deposited to the account of Harry H. Smith at the First National Bank in Sioux City, Iowa on May 26, 1971.

D. Said check was posted at Des Moines, Iowa and received in the United States mail at the office of Harry H. Smith in Sioux City, Iowa. (See Exhibits 12, 13 and 14).

E. This payment of $13,881.02 also included the following amounts for the named individuals, these amounts were not included in the indicted expenditures.

1. VAL FOX - $1,857.00

Charge: Possession of dynamite.

Disposition: Found not guilty.

2. LARRY STROEMAN - $1,225.00

Charge: Malicious mischief to a motor vehicle

Disposition: Found not guilty.

3. ERVIN LANGEL - $505.00

Charge: Possession of dynamite.

Disposition: Dismissed because of connection in Federal count or related charge.

The total of these non-indicted expenditures is $3,587.00 which together with the indicted $10,294.02 equals the total payment of $13,881.02.

4. With respect to Count IV of the indictment, (a) a payment of $4,629.05 was made to Harry H. Smith in Sioux City, Iowa, for the following: $801.30 for the printing costs with respect to the appeal of *Langel et al. v. United States*; $2,818.75 for Donald O'Brien for his services in the appeal of *Langel et al. v. United States*; $1,009.00 to pay the fines and court costs incurred by Lenton Davis on the basis of the criminal charges brought against him in Woodbury County, Iowa for perjury to which said Lenton Davis pled guilty to the lesser charge of obstructing justice. (b) This payment was made by Check No. 870, dated August 30, 1971, drawn on the Strike Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa. (c) This check was deposited to the account of Harry H. Smith at the First National Bank in Sioux City, Iowa on August 31, 1971. (d) Said check was posted at Des Moines, Iowa and received by the United States mail in the office of Harry H. Smith in Sioux City, Iowa. (See Exhibits 15, 16, 17, 18 and 19).

5. With respect to Count V of the indictment, (a) a payment of $1,464.00 was made to Harry H. Smith for his services and costs in the representation of the following: $685.00 for Lenton Davis with respect to the charges in Woodbury County, Iowa for perjury to which he pled guilty to the lesser charge of obstruction of justice; $779.00 for the appeal of *Langel et al. v. United States*. (b) This payment was made by Check No. 1193, dated January 10, 1972, drawn on the Strike Fund of District Council 11, an

account at the Capital City State Bank in Des Moines, Iowa, in the amount of $6,800.50 of which $1,464.00 represents a portion thereof. (c) This check was deposited to the account of Harry H. Smith at the First National Bank in Sioux City, Iowa on January 12, 1972. (d) Said check was posted at Des Moines, Iowa and received by the United States mail in the office of Harry H. Smith in Sioux City, Iowa (Exhibits 20, 21 and 22). (e) The remainder of the $6,800.50 payment was for the following fees related to the following charges which were not indicted:

1. Kenneth McDonald - $785.00

 Charge: Malicious mischief to a motor vehicle.

 Disposition: Dismissed.

2. Douglas Thorson - $108.00

 Charge: Throwing rocks at cars.

 Disposition: Plead guilty to littering. The individual was fined $25.00 as to each charge of littering plus costs. Those fines and costs amounted to $58.00 of the $108.00.

3. Gerald Weiland - $1,346.00

 At charge: $75.00 for the charge, assault and battery.

 Disposition: Found guilty, sentenced, $25.00 fine.

 Second Charge

 At charge: Malicious mischief - $1,070.00

 Disposition: Found guilty after jury trial.

 In addition, out-of-pocket expense amounts as to the above charges, $276.00.

4. Chris Lauritsen - $150.00

 Charge: Malicious mischief to motor vehicle.

5. Bill Lowe - $150.00

 Charge: Malicious mischief to motor vehicle.

6. James Coffey - $150.00

 Charge: Malicious mischief to motor vehicle.

7. Edward Feldhacker - $150.00

 Charge: Malicious mischief to motor vehicle.

8. Bernard Decker - $125.00

 Charge: Malicious mischief to motor vehicle.

 Disposition: Case dismissed after trial.

9. Loren Lee King - $2,372.50

 Charge: Possession of and failure to pay tax on dynamite used in Spencer bombing.

 Disposition: Found guilty after a jury trial in Federal court. At the time of this bill, the case was on appeal to the Circuit Court of Appeals. The ultimate disposition of the case was a remand to the district court for a new trial, which subsequently ended in an acquittal of the defendant in a trial on October 20, 1972.

The cases of Weiland, Coffey, Lauritsen, Feldhacker, Lowe, Decker and King relate to the Spencer strike.

The total amount of these non-indicted charges is $5,336.50 which together with the indicted amount of $1,464.00 equals the total payment of $6,800.50.

6. With respect to Count VI of the indictment, (a) a payment of $2,308.60 was made to Harry H. Smith in Sioux City, Iowa for his services and costs in the representation of the following: $725.00 for Edward Leffler with respect to the charges in the United States District Court for bombing to which he pled nolo contendere to one count of three-count indictment; $588.60 for Harold Johnson with respect to charges in the United States District Court for bombing which was dismissed and $995.00 for Lenton Davis with respect to charges in United States District Court relating to a bombing and illegal possession of firearms, to which he pled nolo contendere to illegal possession of a firearm, the charges of bombing being dismissed. (b) This payment was made by Check No. 1241, dated February 14, 1972, drawn on the Strike Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa, in the amount of $2,568.60 of which $2,308.60 represents a portion thereof. (c) This check was deposited to the account of Harry H. Smith at the First National Bank in Sioux City, Iowa on February 17, 1972. (d) Said check was posted at Des Moines, Iowa and received by the United States mail in the office of Harry H. Smith in Sioux City, Iowa. (e) The remaining $260.00 which was not indicted was in payment of legal services for Harry Smith relative to federal grand jury in Sioux City, Iowa.

7. With respect to Count VII of the indictment: (a) A payment of $442.00 was made to Burton D. Boudreau in Cedar Rapids, Iowa for a transcript of the testimony in *United States v. Langel et al.* This

▬▬▬▬▬▬▬▬ transcript was for purposes of appeal in that case. (b) This payment was made by Check No. 771, dated March 26, 1971, drawn on the Organization Fund of District Council 11, an account at the Capital City State Bank in Des Moines, Iowa. (c) This check was endorsed by Burton D. Boudreau and negotiated at the Merchants National Bank in Cedar Rapids, Iowa on March 26, 1971. (d) Said check was posted at Des Moines, Iowa and received by said Burton D. Boudreau in the United States mail in Cedar Rapids, Iowa.

10. The strikes at Iowa Beef Processors and Spencer Foods were authorized according to the procedures found in the 1968 Constitution of the AMC & BW.

11. It is and has been for many years past the custom of the Amalgamated Meat Cutters, the United Packinghouse Workers and other members of the AFL–CIO to retain attorneys to handle the legal problems of the union and its members during an authorized strike, and as a part of that practice it is and has been the custom of said unions to pay the legal fees and fines of strikers for civil and criminal charges against union members arising out of the strike. Harry Smith was retained by AMC & BW and its District Council 11 to handle said legal problems during the Dakota City and Spencer strikes which occurred in 1969, 1970 and 1971.

12. At the regular meeting of the Executive Board of District Council 11 held in Des Moines, Iowa, on August 29, 1969, a resolution was unanimously passed, on the motion of Board Member Francis McDonald and the second by Board Member Abdias Alba, "That the Chairman [David W. Hart] of the District Council be authorized to spend the total assets of the organization if necessary to prosecute our actions against IBP." This resolution was passed to further the action taken at the President, Chief Steward, Business Agents and Women's Conference held in Sioux Falls, South Dakota in July of 1969 wherein the delegates unanimously voted to ask membership support of the strike against IBP at the rate of $1.00 per week per member. Moneys collected by the District Council 11 customarily would be placed in the District's strike fund. The August 29, 1969 resolution was intended by McDonald to authorize the Director, David W. Hart, to expend funds of District Council 11 which were in other accounts of the District, including the General Fund and the Organization Fund. The August 29, 1969 resolution was intended by a majority of the board members present at the meeting to give the Director, David W. Hart, authority to expend all funds of the District Council for all purposes which funds are ordinarily and customarily used by the Amalgamated Meat Cutters related to an authorized strike. The resolution was so understood by David W. Hart.

This resolution reflects the customary practice of the District Council of Amalgamated Meat Cutters and its predecessor, United Packinghouse Workers, of granting the District President authority to expend funds of the District for the purposes which funds are ordinarily and customarily used by the union related to an authorized strike.

13. The minutes of the Executive Board meetings are an accurate reflection of the occurrences that took place at those relevant meetings. They are not, however, verbatim transcripts but are, rather, in the nature of summaries.

14. At the times pertinent to the Indictment, the following quarterly financial reports were submitted to and approved by the council:

```
1. 12-1-70 to 3-31-71 - approved 4-19-71
2. 4-1-71 to 5-31-71 - approved 6-25-71
3. 6-1-71 to 8-31-71 - approved 9-17-71
4. 9-1-71 to 11-30-71 - approved 1-13-72
5. 12-1-71 to 3-31-72 - approved 4-10-72
```

These reports are all included in Government's Exhibit No. 6.

Executive Board members voting on the resolution of August 29, 1969, were not necessarily Executive Board members when

the expenditures were made. In fact, three Executive Board members who voted in 1969 were Executive Board members when the expenditures were made.

Contained within the quarterly financial reports are the following items which are summarizations of the corresponding ledger entries as follows:

1. Financial Report No. 1, December 1, 1970 through March 31, 1971, an amount of $442.00 was contained in two checks, one dated 12-4-70,

Organization Fund Ledger

Check No. 746, Iowa Beef Processors Inc., in amount of $75.20 at line 7, page ____ and check dated 3-26-27, No. 771 to Burton Boudreau, line 8, page ____. That will be found in March 1971 Disbursement Ledger.

2. Financial Report No. 2 which is from April 1, 1971 through May 31, 1971 - legal fees in the amount of $24,249.52. There was a check of

Strike Fund Ledger

4-2-71, Check No. 504 to Donald O'Brien in the amount of $3,376.50 contained upon line 4, page 82. Check dated 4-13-71, Check No. 529, Clerk of the District Court, Crawford County (contempt) in the amount of $3,925.00, line 29, page 82. Check dated 5-11-71, Check No. 578, to Harry Smith in the amount of $3,067.00 at line 36, page 86. Check dated 5-18-71, Check No. 600 to Harry Smith in the amount of $13,881.02 on line 22, page 87, for a total amount of $24,249.52.

3. Financial Report No. 3, June 1, 1971 through August 31, 1971 - legal fees in the amount of $5,816.19, was composed of a check dated 8-30-75,

Strike Fund Ledger

Check No. 870 to Harry Smith in the amount of $4,629.05, found at line 19, page 104. Check dated 6-14-75, Check No. 657 to A. C. Headberg in the amount of $721.49 contained at line 30, page 92. Check dated 6-3-71, Check No. 634 in the amount of $400.00, page 92, line 7. There are miscellaneous checks in the amount of $65.65 which make up the total balance of $5,816.19.

4. Financial Report No. 4, September 1, 1971 through November 30, 1971, totaling legal fees of $4,457.10, are contained of checks dated 11-1-71,

Strike Fund Ledger

Check 1005 to Harry H. Smith (Langel, 2-22) for $114.80 contained on line 3, page 115. Check dated 11-5-71, Check No. 1108, Arthur C. Headberg, in the amount of $2,750.00, page 117, line 34. Check dated 11-24-71, Check No. 1126 to Mayer Kantor in the amount of $992.30, line 16, page 118. Check dated 11-18-71, Check No. 1120 to Mayer Kantor in the amount of $600.00, page 118, line 10.

5. Financial Report No. 5, December 1, 1971 through March 31, 1972 - legal fees in the amount of $16,106.96. The date of the checks were 1-7-72.

Strike Fund Ledger

Check No. 1192 by Association Labs in the amount of $334.00, line 35, page 123. Check dated 1-10-72, Check No. 1193 to Harry Smith in

the amount of $6,800.50, line 36, page 123.
Check dated 2-14-72, Check No. 1241 to Harry
Smith in the amount of $2,568.60, line 20, page
127. Check dated 2-14-72, Check No. 1243 to
Harry Smith in the amount of $868.86, line 21,
page 127. Check dated 2-14-72, Check No. 1243
to Frank J. Kneift in the amount of $5,535.00,
line 22, page 127, in the total amount of
$16,106.96.

15. That the customary practice of District Council 11 in paying attorney's fees and fines of members was as follows: the retained attorney submits a bill for fees and fines to the District President. A copy of the bill is sent to the Office of the General Counsel for the International Union. The District President delays paying the bill for a period of time to afford general counsel of the International Union time to state any objection or disapproval of the payment of said bill of attorney's fees or fines. As to the questioned expenditures, two out of the seven bills indicate a copy was sent to the General Counsel by Harry Smith, five do not indicate a copy was sent. The District President then approves the bill for payment by placing his initial on it and then the Business Secretary and President both sign the check for payment. The Business Secretary then enters the check by number and amount and the purpose of said check in a ledger book of the District, which has been marked Exhibits B and C in this record. The Business Secretary prepares a quarterly report of receipts and disbursements for approval of the council of the District from the checks in the ledger. Entries from the various ledgers including the General Fund Ledger, the Organization Fund Ledger, and the Strike Fund Ledger are summarized by the Business Secretary in the financial quarterly report. Marked Exhibit 6 in this record. This quarterly report is given to each of the Board members at the next regular meeting of the council for District 11. The Board members discuss the quarterly report and ask for any clarification. The ledgers and all of the records of expenditures are available to the Board members if they desire to see them. The Executive Board then votes to approve or disapprove the quarterly report.

The customary procedure was to mail the quarterly financial reports to the Board prior to the meeting at their homes. The bills underlying the summaries and the records were available to the Board members at the meetings. However, those bills were customarily not examined. With regard to the specific entry in the financial reports relating to the disbursement of funds from the Strike Fund for legal fees, with few exceptions, that disbursement was not discussed nor questioned.

At the council meetings individual bills are not customarily placed before the Board for approval. They are available to the Board should any member desire to see any individual bill. During times pertinent to the Indictment, general discussions were had at the Board meetings of the progress of criminal cases against various union members arising out of the Iowa Beef and Spencer strikes. Specific cases were generally not discussed. On January 13, 1972, however, the minutes reflect that specific cases were discussed by David Hart in front of the council. This is the only time that specific reference was made to specific cases in the minutes. Whenever David Hart was asked about these expenditures he fully answered the questions asked.

16. The ledger sheets of the Organization and Strike Funds and bills were made available to Executive Board members at their request. No Executive Board member did examine those bills or ledgers, however. It was not customary for individual bills to be examined by Executive Board members.

17. With respect to the payments charged in the Indictment, the following procedure was followed for the payment of each check involved in Counts I, III, IV, V, VI, and VII. That is, David Hart was

personally presented with the bills involved, personally reviewed them, expressed his approval either orally or by initialing the payments, personally directed the Business Secretary to pay each bill, and personally co-signed each check which is the subject which was in payment for each bill.

18. With respect to Count II, due to a need for expedition, there was no bill submitted by Harry Smith. Rather, Smith discussed the charges with David Hart by telephone and Hart then directed the Business Secretary to pay the fines as set forth. (See Exhibit 10).

19. David Hart was generally aware of the nature of the charges against these individuals for whom the question expenditures were made. David Hart was also generally aware of the incidents which were the basis for those aforementioned criminal charges.

20. Some legal bills for the fiscal year ending November 30, 1972, were examined by the Officers' Report Committee of the April 1973 convention. That committee reports to the general membership on the annual financial reports of the President.

21. The quarterly financial reports were compiled annually by the Business Secretary into what was called the annual financial report. The annual financial report was then included in the Officers' Report which was compiled by the District Director to be submitted to the annual convention of the District. Those reports have been marked as Exhibit A in this record and do contain the annual financial report for the fiscal year starting November 1 and ending December 31.

22. The Officers' Report, which contains the annual financial report by the District Director, is then submitted to what is called the Officers' Report Committee of the annual convention. The Officers' Report Committee either goes over the report, including the annual financial report, and either approves or disapproves the financial report. This Officers' Report is also distributed during the convention to all of the members attending the convention.

23. The Officers' Report Committee then reports to the General Convention of all of the membership attending the convention, and the report is either approved or disapproved. During the periods involved in this case, the Officers' Report of the respective conventions was approved by the conventions.

24. The annual report had one lump sum figure for legal fees which was designated as Strike Fund legal fees.

25. The annual financial report and the records of the District Council were audited annually by the International Union auditors.

David W. Hart was familiar with the Constitution and the normal and customary procedures of the International Union and its District Council 11.

It is stipulated that David Hart, the defendant in this case, was and is of the sincere belief that all individuals accused of crimes are presumed innocent until found guilty and do have a right of trial and appeal.

The parties agree that this Stipulation represents all of the facts in this case. It is agreed that the only questions remaining in the determination of this case are questions of law and revolve around the determination of whether these facts constitute a violation of 29 U.S.C. § 501(c).

(s) Lee J. Radek
　　LEE J. RADEK
　　Special Attorney
　　U. S. Department of Justice
　　Washington, D. C.

(s) Theodore L. Preg
　　THEODORE L. PREG
　　Special Attorney
　　U. S. Department of Justice
　　Washington, D. C.
　　DATED:　　1/13/76

　　　(s) David W. Hart
　　　　DAVID W. HART
　　　　Defendant

(s) <u>Lex Hawkins</u>
Counsel for Defendant
<u>DATED: 1/13/76</u>