UNITED STATES of America, Plaintiff-Appellee,

v.

Floyd B. HARMON, Defendant-Appellant.

No. 15724.

United States Court of Appeals Sixth Circuit.

Dec. 19, 1964.

Certiorari Denied March 15, 1965. See 85 S.Ct. 1025.

---

David Anbender and Jerome C. Gropman, Detroit, Mich. (Lawrence A. Burns, Detroit, Mich., on the brief), for appellant.

William H. Merrill, Chief Asst. U. S. Atty., Detroit, Mich. (Lawrence Gubow, U. S. Atty., Detroit, Mich., Richard Coleman, Atty., Crim. Div., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before WEICK, Chief Judge, CECIL, Circuit Judge, and TAYLOR, District Judge.

WEICK, Chief Judge.

Defendant-Appellant Harmon was secretary-treasurer and a business agent of Local 614, International Brotherhood of Teamsters, a labor organization, with its headquarters in Pontiac, Michigan. He was also in charge of its office.

Harmon was convicted by a jury in the District Court on all twenty-four counts of an indictment charging him with embezzlement and conversion of union moneys and funds and making false entries on the union's books with respect thereto, in violation of the Labor-Management Disclosure Act. 29 U.S.C. §§ 501(c) [1] and 439(c).[2] The imposition

---

1. 29 U.S.C. § 501:

"(c) Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, direct-

See note 2 on page 356.

and execution of sentence was suspended by the court and he was placed on probation on counts 1 through 24 for a period of two years and fined $1,500. on count 1.

In his appeal Harmon contends (1) that his use of the funds of the union for personal purposes did not constitute the crime of embezzlement, and (2) that the trial court erred in permitting Government counsel to call three witnesses, who were co-union officials, and to question them concerning the boat, "The Princess Enterprise," when the Government knew that these witnesses would invoke their privilege against self-incrimination.

Evidence was offered by the Government which tended to prove that Harmon utilized credit cards, issued to the union by major oil companies, for the purchase of gasoline, supplies and equipment for his boat "The Princess Enterprise"; that during the period of the indictment these purchases totaled about two thousand dollars and were made by Harmon in marinas in the greater Detroit River area; that these purchases were billed to the union by the oil companies and were paid for by union checks drawn on its bank account, signed by Harmon; that Harmon approved the payment of all union bills and signed the checks; that Harmon told a boat marina operator, Roat, not to let his employees know about the arrangement; that Harmon never told the union bookkeeper about the boat or that the invoices were for boat expenses; that a former recording secretary of the union did not know that expenses in connection with the boat were being charged to the union and there was no discussion of a boat being used for the union at union meetings which he attended; that some other union officials did not know of the boat being used for union business; that Harmon did not

show receipts for these expenses to some of the union trustees, although requested to do so; that shortly before a Labor Department audit was made of the union's books, Harmon paid back to the union $1,515.67; and that a Labor Department Investigator asked Harmon about the expenses and he did not answer the questions or tell the Investigator that the expenses were for union business.

Harmon, in his defense, offered evidence of a number of witnesses who testified that union business was conducted by him on the boat.

The District Judge submitted this disputed issue of fact to the jury under proper instructions, which are not in question here. The jury resolved the conflict in favor of the Government. The question raised by Harmon is whether this misuse of union funds constituted embezzlement and conversion.

The evil sought to be remedied by Congress was stated in the Act, as follows:

"(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquir-

ly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

**2.** 29 U.S.C. § 439:

"(c) Any person who willfully makes a false entry in or willfully conceals, with-

holds, or destroys any books, records, reports, or statements required to be kept by any provision of this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both."

ing any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy." 29 U.S.C. § 501(a).

It was the claim of Harmon that although the words in the statute, "embezzles * * * or converts to his own use," are in the disjunctive, they are synonymous; that the union's checking account was a chose in action representing a debtor-creditor relationship between the union and the bank, and was intangible property not capable of embezzlement or conversion.

We are unable to follow this reasoning. We think the crime of conversion has even wider application than embezzlement. Congress recognized that there was a difference between embezzlement and conversion by including both in the statute. The union's bank account would certainly come within the scope of the broad language of the statute, "moneys, funds, securities, property, or other assets of a labor organization." 29 U.S.C. § 501(c).

■ The language in the statute, "embezzles, steals, or unlawfully and willfully abstracts or converts to his own use," would seem to cover almost every kind of a taking, whether by larceny, theft, embezzlement or conversion.

In § 501(a) of the Act Congress indicated rather clearly its policy with respect to the fiduciary responsibility of officers, agents and representatives of labor organizations, and it would appear that technical common law distinctions of various types of crimes were not intended to be rigidly applied. Cf. United States v. Page, 277 F.2d 3 (C.A. 2, 1960); Arbuckle v. United States, 79 U.S.App. D.C. 282, 146 F.2d 657 (1944).

In Morissette v. United States, 342 U.S. 246, at pages 271 to 273, 72 S.Ct. 240, at page 254, 96 L.Ed. 288 (1952), the Court, in construing 18 U.S.C. § 641, said:

"It is not surprising if there is considerable overlapping in the embezzlement, stealing, purloining and knowing conversion grouped in this statute. What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to *take away from one* in lawful possession without right with the *intention to keep wrongfully.*' (Italics added.) Irving Trust Co. v. Leff, 253 N.Y. 359, 364, 171 N.E. 569, 571. Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but

which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

"The purpose which we here attribute to Congress parallels that of codifiers of common law in England and in the States and demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses."

▉ In our opinion the offenses of embezzlement and conversion within the meaning of the Act, were established by the evidence in this case. United States v. Decker, 304 F.2d 702 (C.A. 6, 1962).

The second point presents a more serious problem. The Government called three witnesses in rebuttal, who were the vice-president, business agent and organizer of the union. The Government's purpose in calling these three witnesses was to refute testimony offered by Harmon that the boat was used for the transaction of union business. After answering a few preliminary questions concerning their names, places of residence, and position with the union, they invoked their privilege against self-incrimination and refused to answer questions about whether they knew that the boat was used by Harmon for union business.

Regarding the knowledge of Government counsel that these witnesses would take the Fifth Amendment, their counsel made a statement to the court.[3]

The trial judge made findings on this issue.[4]

The court gave cautionary instructions to the jury.[5]

3. "The Court: Just a minute.
"Government's counsel informs the Court that they did not know whether he was going to take the Fifth Amendment before he took the stand.
"Mr. Woods: That isn't what he said, your Honor. He said he did know. He was advised by this witness.
"The Court: Let's get it clear.
"Mr. Coleman: Your Honor, this is the Government's position. I cannot tell the whole position, your Honor, without violating the Grand Jury Rule. So I will eliminate part of my answer.
"The Court: All right.
"Mr. Coleman: I will talk just about certain matters.
"Certain witnesses were questioned last Friday, and they did give answers. We were informed by counsel that they were going to take the Fifth Amendment today. We called them in. We talked to them. They said they would take the Fifth Amendment. Then we stressed to them certain duties and obligations of these witnesses. Certain things they should search their own minds and consciences for. Then we left them to do that searching of the conscience.
"The Court: You have not talked to them since?
"Mr. Coleman: We have not talked to them since.
"May I add one thing, your Honor? May I add this, no matter what went on then, it is case law position that the Government, no matter how much a witness may say beforehand that he will take the Fifth Amendment, that you never really know the witness is going to take the Fifth Amendment until he is up on the witness stand, until he has the oath administered to him to tell the truth, before the Judge and jury and the question is put to him. That is case law." (Joint Appendix, pp. 306a–307a)

4. "Upon review of the cases and hearing the able arguments of counsel, it seems to the Court that this is not the situation in which a mistrial should be granted.
"In the first place, in view of what is before me, I can not find that the Government knew what action this witness would take at the time he was called to the stand.
"Certain representations, I am told, had been made to him and had been left unanswered.
"In addition, I think the cases are clear that the Fifth Amendment cannot be asserted in advance of questions actually propounded.
"If the law were otherwise, it would preclude a Court's examination into the reasonableness of the grounds asserted." (Joint Appendix, p. 311a)

5. "The Court: Now, ladies and gentlemen of the jury, I want to say something to

■ The privilege against self-incrimination may not be asserted in advance of questions actually propounded. Marcello v. United States, 196 F.2d 437 (C.A. 5, 1952).

In no event may the witness refuse to be sworn. United States v. Romero, 249 F.2d 371, 375 (C.A. 2, 1957).

Professor Wigmore in his work on evidence says at page 388:

"The privilege is merely an option of refusal, not a prohibition of inquiry." 8 Wigmore, Evidence, § 2268 (3d ed. 1961); 98 C.J.S. Witnesses § 436, page 252; United States v. Benjamin, 120 F.2d 521 (C.A. 2, 1941); Mulloney v. United States, 79 F.2d 566, 581 (C.A. 1, 1935).

The cautionary instruction has been held to cure any error in the calling of the witnesses. United States v. Romero, supra; United States v. Amadio, 215 F. 2d 605, 614 (C.A. 7, 1954); United States v. Hiss, 185 F.2d 822, 832 (C.A. 2, 1950); Weinbaum v. United States, 184 F.2d 330 (C.A. 9, 1950).

■ An erroneous cautionary instruction to the giving of which no objection was made, does not constitute reversible error. Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963).

■■ Before a witness is entitled to refuse to answer a question, the danger to be apprehended must be real and appreciable, and not a danger of imaginary and unsubstantial contingency. In re Atterbury, 316 F.2d 106 (C.A. 6, 1963). The privilege extends not only to answers which would incriminate, but also to those which would furnish a link in the chain of evidence needed to prosecute the witness for a federal crime. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

The Government contended that defendant did not have the right to hand pick the witnesses concerning the use of the boat, and it had a duty to resort to all sources of supply with respect to this information. The Government did not claim that it had any information to the effect that these three witnesses had been engaged in any wrongdoing.

The case against the defendant was supported by strong, corroborated evidence. The testimony of the three witnesses in question was not needed.

■ The defendant's cross-examination of each of these three witnesses was directed largely to the fact that they had told Government counsel that they would take the Fifth Amendment.

Considering the record in its entirety, we do not think that the calling of these three witnesses constituted prejudicial error.

Defendant did not claim that Government counsel was guilty of misconduct. His claim was that the trial judge erred in permitting Government counsel to call these three men as witnesses. We do not believe that the trial judge had the right to preclude either party from calling witnesses. The District Judge had the opportunity to pass upon the issue only when the witnesses were sworn and invoked their privilege.

Government counsel asked only a few questions of each of these three witnesses. The trial judge gave proper cautionary instructions.

■ Harmon complains about a short excerpt from Government counsel's opening argument to the jury.[6] He made no

---

you at this time for your careful consideration.

"The fact that a witness, called by the Government, refuses to answer certain questions directed to him, which may have some bearing on the case, should not be construed against the defendant, in any way, since the witness, by so refusing to answer, merely stands upon his constitutional right not to sub-

ject himself by self-incrimination to a possible criminal prosecution." (Joint Appendix, p. 316a)

6. "Well, let's put this in even a better perspective. What we tried to do after that, ladies and gentlemen, was to call some people who knew what the ordinary, the necessary, the customary conduct of union business was. We tried

objection to the argument and any error has been waived. White v. United States, 315 F.2d 113 (C.A. 9, 1963). But defendant's counsel answered this argument at great length and again injected the Fifth Amendment issue in the case. Joint Appendix, pages 500(a), 501(a). However, we found no error of which Harmon can complain, in the argument of Government counsel.

Affirmed.

to call other officers and other business agents and put them on the stand, some of these stewards, and let them tell you the proper story of what union business is.

"And we learned from the ones that [764] testified that a business agent has certain companies that he, himself, supervises. That there are 75 to 80 stewards. That the problems they can't solve in the matter of grievances they take to their individual business agent who is in charge of their company." (Joint Appendix, p. 473a)