**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**George VITALE, Defendant-
Appellant.**

**No. 73–1559.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1973.

Decided Jan. 15, 1974.

Sanford Rosenthal, Detroit, Mich., for defendant-appellant; George Stone, Detroit, Mich., on brief.

Laurence Leff, U. S. Dept. of Justice, for plaintiff-appellee; Ralph B. Guy, Jr., U. S. Atty., on brief; Atlee W. Wampler, III, Sp. Attys., U. S. Dept. of Justice, Detroit, Mich., of counsel.

Before McCREE and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

PER CURIAM.

This is a direct appeal from a conviction for unlawfully and willfully appropriating for his own use the property of a labor union of which appellant was an officer in violation of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 501(c). Appellant was sentenced to two years probation and was fined $1,000. The sole issue before us is whether the evidence presented at trial is sufficient to support the verdict of guilty rendered by the jury. We hold that it is.

Section 501(c) provides that

[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, *directly or indirectly*, shall be fined not more than $10,000 or imprisoned for not more than five years, or both. (emphasis added).

As we have stated before, "[t]he language in the statute, 'embezzles, steals, or unlawfully abstracts and converts to his own use,' would seem to cover almost every kind of taking, whether by larceny, theft, embezzlement or conversion." United States v. Harmon, 339 F.2d 354, 357 (6th Cir. 1954), cert. denied, 380 U. S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963 (1965).[1] Other courts have agreed that "[i]n section 501 Congress defined 'in the broadest terms possible the duty which the new federal law imposes upon a union official.'" United States v. Silverman, 430 F.2d 106, 113 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), citing Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608, 617 (E.D.Pa.), aff'd per curiam, 284 F.2d 162 (3d Cir. 1960), cert. denied, 365 U. S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). In the *Silverman* case, the court, in discussing the wide range of

---

1. In that case, where we upheld a conviction under the Act of a union officer who had purchased gasoline, supplies, and equipment for his boat by a credit card issued to the union and in which the bills for these purchases were paid for by the union by checks drawn on its bank account and approved and signed by the officer convicted, we also observed that "[i]n § 501(a) of the Act Congress indicated rather clearly its policy with respect to the fiduciary responsibility of officers, agents and representatives of labor organizations, and it would appear that technical common law distinctions of various types of crimes were not intended to be rigidly applied." 339 F.2d at 357. Section 501(a) provides:

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organizations as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

conduct that the statute was intended to prohibit, stated:

> The fiduciary role that labor officials must occupy is defined in section 501(a) to include a duty to hold the union's property solely for the benefit of the union and to expend it only in accordance with its constitution, by-laws and resolutions. Decisions finding violations of the criminal provision of section 501(c) have also emphasized the elements of appropriate union benefit and proper union authorization. Section 501(c) is read as requiring an intent to deprive the union of the use of its funds and *either* a lack of union benefit from the expenditure *or* a lack of proper authorization for the expenditure. 430 F.2d 106, 114.

And in United States v. Dibrizzi, 393 F.2d 642 (2d Cir. 1968), the court held that even if the union authorized and ratified the expenditures with full knowledge of all the facts, an officer is not for that reason absolved of a violation of the Act.

■ In examining the sufficiency of the evidence in this case, we are cognizant that we must view the evidence presented at trial in the light most favorable to the government, United States v. Ferrara, 451 F.2d 91, 93 (2d Cir. 1971), cert. denied, 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489 (1972); that "[a]ny doubt as to the wilful intent to commit the act is usually deemed to be a doubt for the jury to resolve," United States v. Dibrizzi, *supra* at 644, citing Morissette v. United States, 342 U.S. 246, 273–276, 72 S.Ct. 240, 96 L.Ed. 288 (1952); and that direct proofs of each element of the crime are not necessary to convict but that circumstantial evidence may suffice. Moreover, the jury is entitled to draw inferences adverse to the accused from acts or a combination of acts even though each act standing by itself may seem to be unimportant, United States v. Dibrizzi, *supra*, and the jury, not a court of review, should be the judge of the credibility and the veracity of witnesses particularly where there is directly conflicting testimony. United States v. Levinson, 405 F.2d 971 (6th Cir. 1968).

■ Teamsters Local 283, of which appellant was vice-president, has had a practice of furnishing Cadillac automobiles for the use of its president, vice-president and secretary-treasurer. In early 1968, the union decided to discontinue the practice of purchasing automobiles for use by these officers, and to lease them instead. The union, through appellant, then initiated negotiations with Klett Cadillac Company for leasing three new Cadillacs and for the sale of the three Cadillacs owned by the union. An agreement was reached in March, 1968, whereby the union leased three new Cadillacs from Klett, and Klett purchased the three Cadillacs owned by the union for $7,560. It is not disputed that the 1967 Cadillac, previously used by the union president, was purchased by Klett for $3,600. However, there is some dispute, not material in light of the other evidence presented, whether the 1966 and 1965 Cadillacs were sold for $1,600 and $2,360 respectively, or vice-versa.

At the time of the negotiations for the sale of the union automobiles to Klett, Klett also agreed to resell two of the Cadillacs to Local 283 officers: one to the president of the union, and the other to appellant, as a "courtesy deal". Klett agreed to sell the automobiles at wholesale, that is, the price at which they would be purchased from the union, and thereby forego any profit. Thereafter, the president paid $3,600 for the 1967 Cadillac, and appellant testified that he paid $1,600 for the 1965 Cadillac, the automobile that had been assigned to him as vice-president, but that by some stroke of luck Klett delivered to him instead the 1966 Cadillac.

The validity of appellant's conviction under section 501(c) turns on the question whether the union received the fair market value of the 1966 Cadillac sold to Klett or, to put it another way, whether appellant by his purchase of the 1966

Cadillac for $1,600 obtained some benefit for himself at the expense of the union. At trial, evidence was adduced that in March 1968, the average wholesale value of a 1967 Cadillac of the model sold to the president was $3,600; that the average wholesale value of a 1966 Cadillac of the model sold to appellant was between $3,180 and $3,415; and that the average wholesale value of a 1965 Cadillac of the model sold by the union was $2,225. Moreover, Thomas Dreisbach, the president and general manager of Klett Cadillac Company and a 50% owner at the time of the transactions in question, testified that during his negotiations with appellant concerning the sale of the union Cadillacs to Klett he personally appraised the three Cadillacs and told appellant that the wholesale value of the 1966 Cadillac was between $2,800 and $3,000. He added that it was in fair to good condition at the time of his examination but that with repairs it would be in good to very good condition. Dreisbach testified that appellant, in response, indicated that he wished to purchase the 1966 Cadillac for his wife, but observed that it was against Teamster regulations to buy directly from the union, and then set the price that he would pay for the automobile at $1,600. Appellant also instructed Dreisbach to make repairs for which Klett subsequently billed the union $370.15. Appellant, in his testimony contradicted Dreisbach's testimony except with respect to delivery of the 1966 Cadillac to his wife and his payment of $1,600 to Klett.

If the jury believed the testimony of Dreisbach, as it apparently did, the union received for its 1966 Cadillac approximately $1,200 to $1,400 less than its fair market value and appellant reaped the benefit of this difference. To be sure, appellant did not pocket directly any union money but the benefit to appellant and the loss to the union demonstrated by the evidence are the same that would have occurred if appellant had received $2,800 to $3,000 from Klett for the vehicle and had accounted to the union for only $1,600. In finding no legally significant difference between accomplishing an unlawful goal by an indirect instead of a direct method, we agree with the observation of the court in United States v. Silverman, *supra*, 430 F.2d at 113, that "[i]t was the plain intention of Congress to hold officers and employees strictly responsible as fiduciaries for the union funds entrusted to them and this intention should not be subverted by the use of indirect methods." *See also* United States v. Harrelson, 223 F.Supp. 869 (E.D.Mich.1963).

Affirmed.