UNITED STATES of America, Plaintiff,

v.

Joseph M. BANE, Sr., Defendant.

Crim. A. No. 6–80372.

United States District Court,
E. D. Michigan, S. D.

June 21, 1977.

On Motion to Reconsider July 13, 1977.

Arnold G. Shulman, Sp. Atty., Detroit Strike Force, Detroit, Mich., for plaintiff.

Mayer Morganroth, Southfield, Mich., for defendant.

## OPINION

FEIKENS, District Judge.

Joseph M. Bane, Sr. was charged in a nine count indictment by a grand jury as follows: counts one through seven for violations of 18 U.S.C. § 1341 (mail fraud) in seven different time periods from on or about November 5, 1970 to on or about March 26, 1974;[1] count eight for conspiracy to violate 18 U.S.C. § 1341 and 29 U.S.C. § 501(c): and count nine for violation of 29 U.S.C. § 501(c) in which it was charged that he embezzled $37,700.81 from the International Brotherhood of Teamsters (IBT).[2]

William H. Hoffa, once a co-defendant in this case, died prior to the commencement of trial. William H. Hoffa's brother, James R. Hoffa, had at one time been the President of the International Brotherhood of Teamsters. Joseph M. Bane, Sr. is the President of Local 614 of that Union.

Trial took place before a jury. In essence, the government's theory was that William H. Hoffa, being the brother of James R. Hoffa, was fitted into a "no show" job as a "union organizer" for Local 614. This arrangement was facilitated by several periodic letters[3] in which Bane represented to the International Union that Hoffa was working as an organizer when, in fact, he was not. Hoffa's salary as an organizer was paid under this arrangement as a special "subsidy" by the International Union.

The government's proof showed that beginning in 1967 and periodically thereafter an organizing subsidy was sought from the International Union. In various letters to IBT Bane stated that this subsidy was needed to permit Local 614 to hire an experienced organizer to help out with the organizing of employees of a large list of potential companies. In reliance on these letters the International Union duly authorized the subsidy.

The government offered no proof that William H. Hoffa was not in fact doing some organizing work in the period from 1967 (at the inception of the subsidy) to 1969 (just prior to the period covered by the indictment). The government's theory was that some time prior to the periods covered by counts one through seven of the indictment, a change occurred. Thereafter, from 1970 to 1974, William H. Hoffa, by arrangement, stopped doing any work, but the requests by Bane for the subsidy, and the payments (now allegedly unlawful) to William H. Hoffa continued. This was the claimed embezzlement.

Bane presented a two-pronged defense: first, that William H. Hoffa did in fact work as an organizer, and that therefore no embezzlement could have occurred; and second, that William H. Hoffa was too ill to work and the subsidy was in fact used as a 'sick pay' arrangement which, he argues, was a well-established union practice. While it is possible for these two seemingly inconsistent defenses to be consistent (i. e., William H. Hoffa did work for part of the period, but was too sick for the rest of the period), the proof presented did not so indicate. The testimony, even of the same witnesses as to these aspects, often suggested *both* that William H. Hoffa was too ill to work and that he was working at the same time.[4]

---

1. Count one covers the period November 5, 1970 to May 13, 1971; count two covers May 13, 1971 to September 20, 1971; count three covers from September 20, 1971 to May 4, 1972; count four covers May 4, 1972 to December 5, 1972; count five covers December 5, 1972 to July 6, 1973; count six covers July 6, 1973 to February 12, 1974; count seven covers February 12, 1974 to March 26, 1974.

2. Count nine also charges aiding and abetting in the violation of 501(c). Title 18, U.S.C., § 2 provides that one who aids and abets another in the commission of a crime shall be punished as a principal. Accordingly, the convictions as

both a principal and of aiding and abetting in this case merge into one conviction as a principal.

3. For the purposes of establishing the offense of mail fraud, the use of the U.S. mails was clearly shown, and is not in issue.

4. A typical example is the testimony of William H. Hoffa's son, called as a witness for the defense, who testified as follows:

"Q Do you know a man by the name of William Hoffa?

The government offered substantial testimony tending to show that William H. Hoffa did not work at all. It offered no direct testimony that William H. Hoffa was not in fact being paid 'sick pay' or that he was healthy.

At the close of proofs Bane moved for a directed verdict of acquittal claiming that the government had failed to show a lack of union benefit from the use of the subsidy funds. Although there was a conflict in the evidence as to whether William H. Hoffa did work, Bane argues that the testimony that William H. Hoffa was too ill to work was uncontradicted, and thus the use of the subsidy as a union benefit, *i. e.*, paying a long-time employee 'sick pay', was incontrovertibly established. Accordingly, Bane argues the government failed to present any proof as to one of the claimed essential elements under 29 U.S.C. § 501(c), and that if there was no embezzlement there was no mail fraud or conspiracy. That motion was taken under advisement and the case was submitted to the jury.

The jury found Bane guilty of the first six of the seven counts of mail fraud, and of embezzlement of union funds. They acquitted him of one count of mail fraud (count seven) and the conspiracy charge in count eight. Bane then renewed his motion adding a motion for judgment of acquittal notwithstanding the verdict.

■ Both motions essentially require a similar task. The Court must view the evidence in a light most favorable to the government, and inquire if such evidence can support a verdict of guilty.[5] *United*

---

A Yes, sir, he was my father.
Q And we're going to start with the years 1970 to December 31st of 1973.
A Okay.
Q Did you know at that time that your father became ill and became progressively more ill during those years?
A Definitely.
Q And did you know by whom he was employed, during those years?
A Teamsters Union Local 614.
Q And do you know how long at that particular point, say 1970, your father had been employed by the Teamsters?
A At that point—you want me to say how long he had been employed by that union?
Q Yes, from before 1970 down when he started with the union.
A Oh, he been with the union 35, 50 years, at least. I wouldn't know the exact dates.
Q And during the years of 1970, Fall and December 31st of 1973, did you have an occasion to visit your father at the union hall?
A Oh, yes.
Q How often?
A I would say on an average no less than two times a month.
Q Okay. And what was he doing when you visited him at that hall?
A Behind his desk making phone calls or seeing people who were in the union, under his supervision."

5. See also *Colella v. United States*, 360 F.2d 792 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966), where, at 802–3, the court stated:
As to the latter motion, made at the conclusion of all the evidence, defendant asserts that there was insufficient evidence to justify a finding by the jury of criminal intent and conversion to defendant's use. Our standard of review is that of determining whether the evidence viewed most favorably to the government and all reasonable inferences therefrom support the jury's verdict. *United States v. Quagliato*, 7 Cir., 1965, 343 F.2d 533, cert. denied, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702; *Genstil v. United States*, 1 Cir., 1964, 326 F.2d 243, cert. denied, 377 U.S. 916, 84 S.Ct. 1179, 12 L.Ed.2d 185.
Using this standard, we cannot say the jury was irrational in its finding of guilt. The knowledge of the falsity of expense vouchers was admitted. Despite the parade of defendant's witnesses attesting to the practice of falsity, the jury had heard the President, Secretary-Treasurer, and Comptroller of the union testify to their ignorance of such a practice and the lack of authority. While defendant and a number of other witnesses testified to defendant's having spent money liberally for lunches, drinks, prescriptions, travel, and other union purposes, the jury could have disbelieved all. Or, believing much of this testimony, it could have believed there was a balance unaccounted for and willfully and wrongfully converted to defendant's own use. The jury might well have considered that witnesses had testified to a practice of falsity relating chiefly to liquor expense and have felt there was no good reason why defendant failed to obtain and forward receipts for food, travel, and other respectable items making up the largest part of his expenditures. It might have believed the union Secretary-Treasurer that defendant had no authority to bring his family to Puerto Rico. It might have drawn adverse conclusions from the destruction of minutes of a union meeting devoted to charges of falsity, the deposit of

States v. Gaines, 353 F.2d 276 (6th Cir. 1965); United States v. Collon, 426 F.2d 939, 942 (6th Cir. 1970). In addition, the motion for judgment of acquittal notwithstanding the verdict requires the Court to reexamine the instructions upon which the case was submitted to the jury.

## MAIL FRAUD

A re-examination of the jury instructions requires that the convictions on counts one through six be set aside. In charging the jury, the Court in essence defined mail fraud as any embezzlement in violation of 29 U.S.C. § 501(c) which employs the mails. Early in the charge, the Court stated (emphasis added):

> "Because the matter of the charge of embezzlement is of primary importance in this case and must be found by you *in order to find whether or not the Defendant is guilty or innocent of the remaining counts*, I will charge you first on that count . . . ."

Similarly, when the Court charged specifically on mail fraud, the charge relied heavily on the earlier definition of embezzlement,

> "The three factual elements required to be proved by the government beyond a reasonable doubt in order for you to find the Defendant guilty of mail fraud in each of the seven counts referred to are these: first, that the Defendant devised a scheme or artifice to embezzle union funds and that union funds were embezzled. In this connection, keep in mind my instructions on the law as they applied to Count 9, the count charging alleged embezzlement of union funds. To put it another way, it is necessary for you first to find beyond a reasonable doubt that the crime of embezzlement was committed, and that the Defendant was involved in that crime before you can find that the crime of mail fraud was committed by him . . . ."

some monies in defendant's personal bank account, or even an attempt in defendant's presence to change the testimony of witness Ugarte.

The district court properly allowed the jury to make its own assessment of the evidence.

The elements constituting a 501(c) embezzlement will be set forth in greater detail in discussing the conviction on count nine. The essence of such a crime, however, unlike fraud, is the breach of a fiduciary duty by a union leader entrusted with union funds in regard to those funds.

 Mail fraud, under 18 U.S.C. § 1341, requires a "scheme or artifice to defraud," which incorporates the common law elements of fraud.[6] United States v. Maze, 468 F.2d 529 (6th Cir. 1972), aff'd, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1973); United States v. Grow, 394 F.2d 182 (4th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); United States v. Dreer, 457 F.2d 31 (3rd Cir. 1972); United States v. Curtis, 537 F.2d 1091 (10th Cir. 1976); United States v. Keane, 522 F.2d 534 (7th Cir.), cert. denied, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1975). Actual, rather than 'constructive' fraud is what is meant for the purposes of criminal prosecution under the mail fraud statute. Post v. United States, 132 U.S.App.D.C. 189, 407 F.2d 319, cert. denied, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1968); United States v. Mandel, 415 F.Supp. 997 (D.Md.1976).

 The test for embezzlement, which focuses on the Defendant's good faith in disbursing union funds falls short of requiring the specific intent to defraud at the time of mailing which must be shown to establish mail fraud. A "scheme to defraud" connotes planning in advance; United States v. Nance, 502 F.2d 615 (8th Cir.), cert. denied, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1974), and involves a planned misrepresentation of a material fact in existence at the time of the mailing of the statement. A scheme to defraud must involve a statement which is calculated to deceive; United States v. Beitscher, 467 F.2d 269 (10th Cir. 1972).

6. Except that the fraud need not be successful or completed. This grows out of the language of 501(c) which expressly punishes any "scheme or artifice to defraud"; United States v. Reid, 175 U.S.App.D.C. 120, 533 F.2d 1255 (1976).

That the jury may have found, when focusing on the embezzlement instructions, that Bane acted in bad faith in disbursing the union subsidy from the International Union does not necessarily mean that they would find that at the time he was requesting the subsidy he intended to disburse the funds in bad faith when those funds were received.

■ The Court's charge did include a later instruction on the elements of fraud. However, the earlier misleading charge was not sufficiently cured by such a brief correct instruction so as to insure that the jury, in rendering its verdict of guilty, was applying the correct legal standard for mail fraud. Jury instructions are to be judged as a whole. *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Mattucci*, 502 F.2d 883, 888–9 (6th Cir. 1974). In order for instructions not to mislead a jury they should be consistent and harmonious; *Smith v. United States*, 230 F.2d 935, 939 (6th Cir. 1956) ["The fact that one instruction is correct does not cure the error in giving another inconsistent with it."]. See also *United States v. Reid*, 2 Cir., 517 F.2d 953, 965; *Berrier v. Egeler*, 428 F.Supp. 750 (E.D. Mich.1976).

■ This is not to say that the Court should direct a verdict of acquittal on these counts. There was evidence that the International Union was knowingly and willfully mislead by Defendant Bane into paying an "organizing subsidy" for Hoffa who was not to do any organizing work. The jury's guilty verdict in part was the application of the wrong legal standard and therefore this part of the verdict must be set aside in favor of a new trial.

## EMBEZZLEMENT OF UNION FUNDS

■ The crucial portion of the defense motion, however, pertains to the conviction of embezzlement contained in count nine.

The elements of a violation of 29 U.S.C. § 501(c) vary somewhat with the facts of each case to which the law is to be applied. First, where it is clear that an expenditure of union funds is authorized and these funds are in fact used for the legitimate benefit of the union, there can be no violation of the law. *United States v. Silverman*, 430 F.2d 106, *modified on other grounds*, 439 F.2d 1198 (2d Cir.), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1970); *United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968); *United States v. Colella*, 360 F.2d 792 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974).

Bane argues that these two propositions are undisputed here. Since the government admits that the subsidy was authorized, Bane argues that because the government failed to submit testimony that William H. Hoffa was healthy, it failed to place in issue the question of the use of the funds for a legitimate union benefit, for Bane says, it was the undisputed policy of the Teamsters to pay such 'sick pay' to their own employees who were unable to work.[7]

However, the policy of paying such sick pay by the Teamsters, as testified to at trial, was by no means an absolute or assumed practice, and thus uncontroverted in its applicability to William H. Hoffa. It was spoken of as somewhat of an uncertain, although probable, thing. For example, Walter Sacharczyk, a man who had been the President of Teamsters Local 334 for some sixteen years and had been with the Teamsters for forty-four years, and would certainly be expected to know of such a policy, cautiously testified in response to questions by defense counsel,

"A. . . . Marshall was sick for a long period of time and he was paid.

Q. Would you say it was a policy then?

---

**7.** As defense counsel stated in his opening statement,

"We will show that it was union policy when somebody was ill to keep them on payroll even if Mr. Hoffa did nothing and that the union can't treat its members any worse than it wants the employer that signs contracts with them to treat their employees; to treat the person whose worked for 35 or 38 years like he was garbage when they come ill."

A. Well, if you get sick, you got nothing else to draw your money from, it would be more or less like an obligation on the local for whom you were working that if you are off sick for a short period of time, whatever period of time they maintain you on the payroll."

Similarly, inconclusive testimony also came from George C. Sholp, a man who had been with the Teamsters for many years, and had been an executive board member of his own Teamster local:

"A. Myself, for one; I had a heart attack in 1961 and I was in Ford Hospital for three weeks. And I worked part-time for about six months and I was paid continuously. Also Mr. Charles Duebeck, Local 337, was off for years. I think, three or four years with cancer. And he was paid at all times. And the custom was, to my knowledge, that I do not know of anybody who was off ill who was not paid when they were off ill, any local union."

The jury was entitled to consider both what these union officials were able to say and what they failed to say, and to consider

the tenor and hesitancy of their statements, and to draw inferences therefrom.

In order to obtain a renewal of the subsidy for each six month period, Bane sent the International Union monthly reports and a renewal request letter,[8] all of which suggested that William H. Hoffa was doing organizing work and, significantly, none of which mentioned that he was ill. Assistant United States Attorney Shulman aptly suggested, in his closing argument, that the jury might infer from Bane's failure to mention Hoffa's illness that 'sick pay' in the form of such a special subsidy might not have been granted by the International Union,

"Now, the contention of the defense is that if he was ill and didn't work, it was sort of a standard policy of the IBT to pay ill employees. . . .

. . . *if it was the policy of the Teamsters to pay people who are ill, and there is nothing wrong with it, why didn't he just tell him?* They wrote letters every six months renewing the authorization through the whole period of the indictment. They told them that they needed it *for organizing*."[9] (emphasis added)

8. One such letter (Government Exhibit # 12) was read into the record:

"February 12, 1974
"Attention: Mr. Frank E. Fitzsimmons
"General President
"Dear Sir and Brother:
"At this time we are requesting an extension of another six months on the organizing subsidy from the International Brotherhood of Teamsters in the amount of $1,000 per month.
"Your consideration in granting this extension will be greatly appreciated.
　　　　　　"Fraternally yours,
　　　　"TEAMSTERS　　　　UNION
　　　　　　LOCAL NO. 614
　　　　"Joseph M. Bane
　　　　"President"
Q Sir, there is certain handwriting that appears in the upper right-hand corner of Government 12. Do you recognize it?
A Yes, I do.
Q Would you please read it and identify what is on there and to whom the initials belong?
A Okay. "Six months, F.E.S." Frank E. Fitzsimmons"

These renewal letters must be considered in the context of the other reports that the International Union required that were testified to,
Q In this particular instance then, sir, are you saying that Local 614 had its own account number within the financial record system of the International Brotherhood for the disbursement of and receipt of a subsidy payment?
A Yes, we could summarize all the disbursements to him.
Q Now, if you move down to the lower part of the page where there is a listing it says "description" and under that appears "organizing subsidy," is that correct?
A Yes, sir.
Q Does that refer back then to the subsidy that was requested in the authorization letter?
A Yes.
Also, they must be viewed in connection with the original letter requesting the subsidy (Government Exhibit # 1) which is attached as an appendix to this opinion.

9. And the prosecutor further argued,
"　. . . Now, what we have shown you is a series of documents which show that

█ Thus, the jury could have found that, in this case it was not a matter of established policy of the International Union, whose funds were being used, to pay an employee such as William H. Hoffa sick benefits in the event that he became too ill to do the special organizing work for which he was being subsidized.

In the alternative, if the jury accepted this as a legitimate union policy, and therefore accorded any "sick pay" paid to William H. Hoffa the status of a "union benefit" as that term was defined for them by the Court, there was still a question for the jury as to whether William H. Hoffa was too ill to work throughout the entire period covered by the indictment. The government offered considerable testimony and documentary evidence tending to show that during the entire period of the indictment William H. Hoffa did no organizing work. The only two times when William H. Hoffa was seen at the union hall or in another union context, which are undisputed were, (1) when he came in to pick up his paychecks, and (2) when he helped settle a dispute with an employer on behalf of a teamster union member who happened to have been closely related to him,[10] through

other long-standing business dealings. This is not to say that there was no evidence that William H. Hoffa did do work. There was some evidence but it may have been disbelieved by the jury.

The fact that the jury convicted Bane of counts one through six, but acquitted him of count seven suggests that they may have considered that only during the time period covered by count seven was William H. Hoffa too ill to work. It is significant in this connection that count seven covered the most recent time period, and the evidence suggested that William H. Hoffa's physical condition became worse as time went on.[11] In addition, Bane's contention that William H. Hoffa was working may have been taken by the jury as an admission that he was not too ill to work throughout the period of the indictment— even if the jury did not accept that he was in fact working.

Accordingly, there was substantial evidence for the jury to decide that William H. Hoffa was not ill during the periods covered by counts one through six of the indictment,[12] or that it was not a union benefit if he was ill to pay him sick pay.

they did some organizing activity. Now, when the organizing activity was in process, they put that on the form and at the bottom of this document. Now, when they had nothing to report, they put that on the form.
Well, the purpose of this exercise, where you see two of these in a row with nothing to report, is to get a point across.
. . . Now you have got to keep in mind that the lynchpin of this whole thing is why submit these forms to get paid. Why doctor the forms if in fact you don't have to doctor them to get paid?"

10. With regard to this latter incident, the prosecution argued that it was more of a favor by William H. Hoffa than an official union action,
"He didn't work with anybody. He didn't organize any companies. He shows up at Price Brothers. We must have had six witnesses on Price Brothers. Who was he out there for a complaint for? Mr. Malowsky. Who is Mr. Malowsky? His renter for 20 odd years. And who else shows up? Mr. Bane and Mr. Walker every day. That's not organizing. That's not his duties, but give him that if you want to. The company was already organized. He was getting paid to organize the unorganized."

11. Even defense counsel, in his closing argument agreed with this.
"Mind you, those weren't the companies for all three years or for 38 months. Those companies were *just the last months in '73 when the testimony shows Mr. Hoffa was at his sickest time*. Mind you, to be fair, why weren't they for all 41 months." (emphasis added)
It appears that the jury may have accepted this limited defense contention in acquitting in count seven. This further suggests that the jury fully understood that William H. Hoffa's inability to work due to his illness, if true, was not merely a plea for sympathy, but rather a valid business concern of the union.

12. Although the convictions as to counts one through six have been set aside in favor of new trial because the jury was not given a correct legal standard—that of fraud as opposed to embezzlement—the jury's finding may be informative where, as here, embezzlement is at issue. If the jury found that he was able to work and did not during six (or any) of the seven time periods at issue this element of embezzlement would be established.

In *United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975), the Second Circuit took the lead in expanding upon the elements of a 501(c) violation as set forth in *Silverman, supra,* and other prior cases. *Silverman* had stated that the existence of a 501(c) violation depended upon "whether the contributions were properly authorized and made for the benefit of the union." (430 F.2d, at 113). Judge Moore, dissenting in part, in *Silverman*, noted that the elements of a 501(c) violation would have to vary under different circumstances. See 430 F.2d, at 113. The Eighth Circuit followed this reasoning in *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), in holding that, in the absence of a valid authorization, a finding that the union would have authorized or ratified the expenditure had they known would acquit the defendant.

In *Ottley*, the Second Circuit dealt with a case where the funds expended for a car were not authorized, and were also not used for the benefit of the union. Ottley, the union president, had approved cars for several other union officials, including one Byrne. The other cars were used to go to and from union meetings, etc., and so led to some union benefit. Byrne, however, could not drive and so he gave the car to his wife for her personal use, and took taxis (which he also charged to the union as an expense). Ottley, who had approved the car for Byrne, was prepared on appeal to accept that the car was not used for union benefit, but argued that he did not know that Byrne couldn't drive and assumed the car had been properly used. The Second Circuit, having in mind the purpose of 501(c) to create a fiduciary duty on the part of union officials, acknowledged that on those facts the crucial element for the government to show was Ottley's lack of a good faith belief that there was a union benefit. The opinion in *Ottley* did not set aside the elements as stated in *Silverman* on *Silverman's* facts. See also *United States v. Santiago*, 528 F.2d 1130 (2d Cir. 1976).

What emerges from this complex judicial experience is a crime whose elements, at least for the purposes of judicial definition, vary in each case. Four possible fact questions may (but need not) arise:

1) Whether the expenditure of union funds is duly authorized;

2) Whether the union, if it knew of the expenditure would so authorize;

3) Whether the expenditure of union funds is made for the benefit of the union; and

4) Whether the officer, in making the expenditure, had a good faith belief that the funds were being used for the benefit of the union.

If the funds are clearly authorized and clearly for the benefit of the union, there can be no violation of 501(c), as indicated earlier; see also *Silverman, supra.* If, however, assuming the funds to be duly authorized, the expenditure was not for the benefit of the union, then the union official's lack of good faith belief in a union benefit, and not the benefit itself, becomes an essential element of the crime; *Ottley, supra.* On the other hand, if an expenditure is instead not authorized, an essential element of the crime becomes whether or not the union, if it had known of the expenditure, would have approved or ratified it. If not, then the duty imposed by 501(c) has been violated; *Goad, supra.* If the union would have approved the expenditure, then the government still must prove either lack of union benefit or lack of good faith belief in union benefit as required by the tests set forth earlier.

In the present case, the authorization has not been questioned and the jury was so instructed. Whether or not the funds were used for the benefit of the union, however, as well as whether or not Bane had a good faith belief that they were to be used for the benefit of the union were both open to question because of the evidence adduced at trial. Faced with a choice, the Court, without objection by either party, focused the jury's attention on the question as to the defendant's good faith belief that the funds were being used for the benefit of the union.

"To determine whether these funds of the union which were paid to William Hoffa were embezzled, you must ask yourselves if the defendant had a good faith belief that the union funds which were paid to William Hoffa were being used for the benefit of the union. Thus, the government must prove beyond a reasonable doubt that the defendant did not have a good faith belief that the union funds which were paid to William Hoffa were for the benefit of the union. If you are not convinced beyond a reasonable doubt that the defendant did not have a good faith belief that the funds paid to William Hoffa were for the benefit of the union, then an embezzlement would not have occurred within the meaning of the law. On the other hand, if you are convinced beyond a reasonable doubt that the defendant did not have a good faith belief that the funds paid to William Hoffa were for the benefit of the union, and that the defendant acted knowingly and willfully, then an embezzlement would have occurred within the meaning of the law.

"I would now like to define for you what I mean by 'good faith belief'. A good faith belief, as commonly used, means a belief or state of mind denoting honesty of purpose; freedom from intention to defraud; generally speaking, it means being faithful to one's duty or obligation."

This test, which began in *Ottley*, and was referred to with approval in *United States v. Santiago*, 528 F.2d 1130 (2d Cir. 1976),[13]

serves to protect the defendant. It broadens his defense in a manner that carries out the underlying purpose of 501(c), which sought to create a duty of candor and trust on the part of the union officials.

Accordingly, where there is no doubt as to the employment of funds being for the benefit of the union, the Court may consider the existence or lack of union benefit as the appropriate legal issue.[14] Where, as here, there is a question as to whether the funds were used for personal or union benefit, the appropriate issue becomes not whether there in fact was a benefit to the union, but rather whether the defendant had a good faith belief that the funds were being used for the benefit of the union. Thus, for example a union official who had placed a sauna in his home with union funds might argue that the union derived a benefit from having healthier officials. However, a jury considering whether he, in good faith, believed this, might still return a guilty verdict. On the other hand, as in *Ottley*, this standard protects the innocent union official without whose knowledge funds are embezzled.

Defendant's motion must be granted in part and denied in part. The convictions on counts one through six of the indictment are set aside for a new trial; the verdicts of not guilty as to counts seven and eight, of course, stand, and the verdict of guilty on count nine must also stand. An appropriate order is entered contemporaneously herewith.

---

**13.** In *Santiago*, as here, there was some doubt as to whether the funds were used for the benefit of the union, and the trial court charged the jury to consider whether or not defendant had a good faith belief that the use of the funds was for the union's benefit (at 1133–4);

The trial judge instructed the jury to measure appellant's conduct by the test we approved in *United States v. Ottley*, 509 F.2d 667, 671 (2d Cir. 1975), viz., did appellant have a good-faith belief that the funds were being used for union business and that the union had properly authorized the expendi-

tures or would properly ratify them. Measured by this test, appellant's conduct was found wanting. We see no error.

**14.** Note that if funds were not authorized, and the finder of fact concluded that their expenditure would not be ratified by the union membership had they known of the expenditure (as in a case where the union by laws or resolutions prohibit the expenditure) even if the funds were used for the union's benefit, a breach of the duty imposed by 501(c) would have occurred.

APPENDIX:

Photocopy of Government's Exhibit # 1

## GENERAL DRIVERS AND HELPERS, LOCAL No. 614

of the

**International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America**

1410 S. TELEGRAPH ROAD

Phones: JOrdan 6–3836

FEderal 4–4573

PONTIAC, MICHIGAN

*President*
JOSEPH M. BANE

*Secretary-Treasurer*
REX F. LILES

February 13, 1967

International Brotherhood of Teamsters
Chauffeurs, Warehouseman & Helpers of America
25 Louisiana Avenue, N. W.
Washington, D. C. 20001

Attention: Mr. James R. Hoffa, General President

Dear Sir and Brother:

Per our telephone conversation of February 7, 1967 in which I requested assistance, it is my understanding this assistance will be in the form of a subsidy from the International Brotherhood of Teamsters in the amount of $1,000.00 per month for a six (6) month period subject to renewal at the end of said six months.

This assistance is needed due to recent excessive organizing expenses. In the last few months we have had several elections conducted by the National Labor Relations Board such as: Mills Products, Inc., where we merged with the Independent Metal Union of Walled Lake, Michigan, Local 614 was chosen as the bargaining agent for the 250 people employed there. At G & W Engineering an election was conducted by the National Labor Relations Board on February 3, 1967 and the 90 people employed there chose Local 614 as their representative. At American Plastics Local 614 again was chosen as representative for the 200 employees. We are in the process of negotiating agreements for these companies.

The following is a list of companies we are currently working on.

Terry Machine Co., Drayton Plains, Michigan
Interstate Manufacturing, Romeo, Michigan
Morgan Electric, Southfield, Michigan
Searay, Oxford, Michigan
Manufacturing Products, Troy, Michigan
Briney Manufacturing, Pontiac, Michigan
Gilbert Shoes, Pontiac, Michigan
Ford Tractor, Romeo, Michigan
Grimaldi Car Sales, Pontiac, Michigan
Stahl Company, Plymouth, Michigan

We are also in need of an experienced organizer who has had some background in this field. As you know, my business agents and organizers are fairly new.

Any assistance you can render will be appreciated.

Fraternally yours,
TEAMSTERS' LOCAL UNION NO. 614

(s) Joseph M. Bane
Joseph M. Bane
President

JMB:1b
cc: file

OPINION

## ON MOTION TO RECONSIDER

Joseph M. Bane, Sr. moves the Court to reconsider a denial of his earlier motion for judgment of acquittal. He argues that the Court, in its earlier opinion, set forth an incorrect legal standard for upholding his conviction for embezzlement of union funds. He bases his argument on two recent cases which were not brought to the Court's attention at earlier arguments; *United States v. Vitale*, 489 F.2d 1367 (6th Cir. 1974); *United States v. Hart*, 417 F.Supp. 1314 (S.D. Iowa 1976).

While these two cases do, at times, set forth different legal standards in some of their language from that applied by the Court in its earlier opinion in the present case, the cases can readily be reconciled on their facts. Bane points out that *Vitale* states (at 1369);

"Section 501(c) is read as requiring an intent to deprive the union of the use of its funds and *either* a lack of union benefit from the expenditure *or* a lack of proper authorization for the expenditure." (emphasis in original)

In so saying, however, the Court in *Vitale* was quoting from *United States v. Silverman*, 430 F.2d 106, 114 (2d Cir. 1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). *Silverman*, referred to in detail in the Court's earlier opinion in the present matter was correct in so stating on its facts. More recent caselaw[1] was considered controlling.

*Hart*, cited by Bane, does state in so many words that once a union expenditure is authorized no embezzlement can occur. On its facts, since the funds in *Hart* were used for the purpose for which they were authorized, that standard may have been correct. In the present case, however, the government's theory was that Bane received a subsidy authorized for disbursement for union organizing but used, in fact, to be paid to a man who did not work at all. If the *Hart* standard were applied as ar-

gued by Bane, any expenditure, once the funds for it were approved—even if that approval was not for the purpose it was actually used for—would be beyond the reach of the law. Insofar as language in the *Hart* opinion suggests otherwise, this Court respectfully differs.

Accordingly, no reason is presented for reconsideration, and Defendant's motion must be denied. An appropriate order is entered contemporaneously herewith.

---

1. *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), for example, was decided contemporaneously to *Vitale*, and *United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975) was decided subsequent to *Vitale*. *Ottley* is well recognized as a leading case in a trend toward refining the simplistic holding of *Silverman*.